Good morning, Your Honors. May it please the Court. I'd like to reserve five minutes for rebuttal, please. My name is Craig Watson, and I'm here today representing appellant defendants Robin Richard and Michelle Godin, who are both registered nurses. As this Court is well aware, this is a deliberate indifference case, so I'd like to get right to the legal standard that's applicable in this case. With respect to deliberate indifference, this circuit has held that it is an extremely high burden of proof, and that's important when looking at the facts of this case, and that burden is placed on the plaintiff in this case. With respect to deliberate indifference, there has to be the knowledge, and it's a subjective knowledge, of the individual official that there is a risk of substantial harm, and then that official has to disregard that risk in order for there to be a finding of deliberate indifference. And so this Court need only look at the conduct of the nurses in this case to make a determination as to whether there was a disregard for a risk of substantial injury, a substantial harm in the case. And the Court, this Fifth Circuit, in numerous cases has delineated what is, how do you disregard a known risk? And the Court has looked at, you need to refuse treatment, you need to ignore complaints, or you need to intentionally mistreat the patient. So those are the three things that this Court would be looking at for a determination, are those factors present in this case. Didn't the District Court say that both nurses acknowledged they ignored the complaints that were written down? They didn't read the complaints? I think that's one, the Court said that, but if you look at actually what occurred in this case, there is a form that's filled out by the inmate itself that says, nature of complaints. But that form is always done the day prior to the nurses seeing the individual patients. So what the nurses testified to is when they see the patients, those complaints often change. So they use the healthcare practitioner and patient relationship to determine that day what are those complaints. And so if you look through the record in this matter, you'll see, so for, we'll take nurse Robin Richard, for example, she gets a intake form from the inmate, which says that I'm having, I need ibuprofen, I have back pain, can you fill it ASAP? She receives that the next day, and he is in court that day, which is why she doesn't see them. But nevertheless, she still fills the ibuprofen, which was requested. So clearly she's reviewed that complaint, and she's treated it. So the very fact that she fills that shows that this cannot be delivered indifference. And so- Do you have a case that stands for, if you give any treatment, there can't be deliberate indifference? You argue that more below. I do, and if you look at, I can tell you that it's not, it doesn't say it in those terms, but if you look at the precedents in this circuit, the facts delineate such, meaning that all that courts are looking at is if you're going forward and you're actually providing treatment, the decision of whether that treatment is appropriate or wrong is what this court has said, that's the optimal standard of care and cannot be delivered indifference. So what I'm presenting to you is that the record- Correct, because the plaintiff would have- What's the best case for that? The opportunity, the Gobert decision versus Caldwell is a case which involved a leg injury where the court found there that the doctor actually knew of the substantial risk and didn't disregard it because there was no purposeful neglect. And that's what I think that this court needs to look at is, did the nurses do anything for them to meet that high, high burden of egregious intention? So where did the district court, in your mind, go wrong? I think they went wrong, Your Honor. To be honest with you, I think that the court looked at the unfortunate and admittedly tragic end result and applied what would be a negligence standard using hindsight to get the diagnosis of diverticulitis in the mind and mens rea of these nurses, which is undisputed they did not have. So if you look at the substantial risk of harm here, back pain is not something that a nurse is going to believe is going to result in the death of an individual. Also, constipation is not going to do that. I thought there was a reference, though, to toxicity. There was a reference to toxicity, and again, that was a complaint that was addressed by the nurse. If you look at the record evidence in here, that toxic, it was in the complaint, but the nurse actually wrote that in on the document itself, which indicates that she had that patient discourse with the patient. So that was addressed by her providing the biscodol, which was the laxative for the individual, and allowing him a follow-up appointment at a later time with a nurse practitioner. So they may argue that that was not good enough, that she missed the signs and symptoms, but those sound in medical negligence and not in delivered indifference. Moreover, that was just one isolated incident with Robin Richard. It's not as if that was the last conduct that a health care provider had with this patient. The next day, Michelle Godin saw the patient and, again, received a report that he was vomiting, that he had constipation. It's important for this court to know, if you're looking at the substantial degree of harm, that prisoners oftentimes, as was testified to, it's one of the most common sick call appointments, is, I've got constipation. Prisoners typically eat very starchy foods and they're not moving around, they're relatively immobile, so it's not something that's going to, in a prison, rise to the level of believing that it's going to be a substantial risk of death at a later instance. When they start throwing up, that's the tip-off. Something really bad is going on. It's possible, and I think that the nurse in here testified in her deposition that, once he threw up, he had indicated, and it was her belief, that that throw-up was due to the foul taste of the magnesium citrate that she had administered to him. So, again, what we've got is, we've got an individual that is responding to the complaints. Whether they don't like the response, that's negligence, but we have somebody here that complained of constipation and she went to the nurse practitioner to get an order for a stronger laxative for this individual. That shows due diligence. That shows a course of conduct that cannot be delivered in difference. I think what the trial court did here is that they looked at the end result and said, if this patient, this patient obviously was much worse off, but at the time that he presented to my healthcare providers at the hospital for the, at the clinic for the physical presentation, those symptoms were not there. And it's important to note that the individual had a bowel movement, and that's very, very important in this case because it shows that the complaints of constipation had not risen to the level where there was an obstruction where a nurse would be in a position to believe that substantial risk of harm could happen. He had come back, he had a bowel movement, she said, go ahead and take the magnesium citrate over the weekend anyway. Take it now and it'll be available to you over the weekend. That was the last time that my nurses had the opportunity, pursuant to protocol, to treat this particular patient while on the facility. The next interaction that they had, and again, Robin Richard is now out of the picture, and I would submit to you that there is zero evidence that her prescribing of the biscadol to the individual can constitute deliberate indifference. She is, the court I think just was wrong on that, and it doesn't rise to the heightened level. The next day, there's a phone call that's placed to Michelle Godin, and there is a discrepancy here in regards to whether she received that phone call and whether she returned it back. But I would submit to this court that that's not material to this case, because if you look at the testimony, and you take even what they say is true, when Michelle, she did return the call back, and she says she doesn't remember talking about this particular patient, that the patient had been addressed by another nurse. We know that that other nurse testified that she in fact said, continue to monitor if it gets worse, call me. That's exactly what happened here. What the district court had done here is they said, well, there's other things that should have been done in this case. There should have been monitoring, that she should have ordered that the officers monitor them. Well, in fact, that's not a material issue of fact here, because in fact the patient was monitored. We know he was monitored, because all of the officers had testified that the individual was placed in a segregated room, and he was watched, and then obviously he was monitored, because the nurses then were contacted for determination as to what to do. It's also important for this court to know that under the protocols of the hospital, of the prison, that the officers themselves are vested with the authority at any point in time to send the individual that they believe that they're in need of emergent medical assistance to a hospital. They could have done that. You've got the testimony of Lieutenant Troy Meyer, that in fact said if he could not have gotten in touch with one of the nurses on Sunday, he would have gone ahead and said the patient there anyway. So we've got the nurses who do not have a duty to the patient once they leave that individual facility, but as a courtesy, they do make... Had he gone to the hospital before the final fatal visit? In fact, he had, which goes to sort of the motivation in this, is that he had been to the hospital sent by prison staff, including the nurses in this case, for glucose, for very high glucose levels. So if you look at the context of this lawsuit, and why would these nurses ignore the symptoms, why would they refuse to treat them, the facts just don't mesh up. He had been sent to the Provost Medical Emergency Center twice prior. Twice? Twice, for high glucose levels. And then we have, obviously this was an acute injury that had gotten much worse over the weekend, where my practitioners didn't have the ability to see the patient. It's important to know that I think the only way in which a district court and this appellate court could reach the level of deliberate indifference would be to a finding that my nurse said, do not monitor him. If that were the case, maybe. Or do not send him to the hospital. Or do not give him the biscadol. Or do not, some affirmative action where they get to the level of rising to that egregious conduct. Here we have monitor him by one of the nurses. We have continued the medication of giving him the magnesium citrate. That was an order that was continued prescribed. And we've got, if he gets worse, call us back. All of those are issues that can sound a negligence. They can bring in their experts at trial and say, she should have done this. She should have contacted Ty Gotro. If you look at, and it was, I'm very hard pressed to find, and I can't think of one off the top of my head where this court has looked at medical practitioners in a scenario like this and actually found deliberate indifference. The cases that have come out, there was one in July, Bronner versus Cudi, that was another paraplegic inmate that sued over decubitus ulcers. And in that case, this court reversed the decision in there. Again, finding that that burden is heightened. It has to be a culpable conduct which rises to the level of a purposeful, deliberate act. And we simply do not have that here. We've got an individual inmate who made complaints, and if they're upset with the way that they were responded to, they have their negligence theory to recover. They did do an autopsy on him. They did do an autopsy, and they found in the autopsy that he had acute peritonitis when his bowel was obstructed, which could not have been the case on Friday when my nurse had the last opportunity to see him because he had reported that he had the bowel movement. So clearly he had gotten wrong. He had gotten worse. And also if you look at this in terms of the diverticulitis, when the warden had called the next of kin to inform them of the death of the patient, the sister had said, well, the diverticulitis must have finally got him. And everybody was surprised because we had never known that. If you look at the record, and it's in this case as well, even when he was sent to the hospital, he didn't report that because he did not want to have surgery because he did not want to have a scar. And so that information is in the record, and it was never relayed to us at the hospital. He relayed to us that he had an atrial septic defect. He related that he had hypertension. He had related that he had arthritis, but never mentioned the diverticulitis. So we were not in a position to know that that was that is the record reflect that the diverticulitis is what caused the blockage. I think that the autopsy is in the record, which does indicate, I believe the autopsy says acute peritonitis, which is the inflammation of the peritoneum, obstructive due to diverticulitis. Clearly this patient had a previous bout of an issue with diverticulitis that was never reported to us. And so it's our submission that if you look at the mens rea, which this court has to place themselves in, because the Supreme Court in the Farmer decision, and it's been cited by the court, says that you have to look not only at the facts that draw the inference, but that the individual did in fact draw that inference. And here we do not have our nurse thinking that his back complaints, which is a very common given the bedding that the inmates are on, could cause a death of this patient or substantial harm. Additionally constipation, when you then have a bowel movement and you're giving a laxative, does not make you believe that this individual is going to progress to the point where they're going to need emergent medical help. And again, the officers are in the facility with him over the weekend to make that decision as to whether he needs to be transported. And then even more indicative, as we get to the end of the case on Sunday, February 24th, it's dispositive that when they in fact call my nurse, Godin, again and say he's not doing well, he's got low blood pressure, she doesn't say, I don't care about him, refuse treatment, don't do anything, what does she tell him? She says, take him to the hospital. So that shows there again that there is not a refusal, there is not an ignoring of him. As soon as his vitals looked bad, take him to the hospital? That's the first time the vitals were? First time that the vitals were reported to the level that the nurse felt that he needed to go to the hospital. As you know, you've covered, you have command of this area and it's a seamless sort of presentation, but we are seeing like in the Henson case, which you stressed in the reply brief, these institutional situations where we have officers and nurses only and nurses by phone, and then negligence or gross negligence occurs because diagnoses can't be made. But your answer would be, well, but it's a center focus, there's got to be intentionality, purposeful, and in those institutional vulnerabilities, there isn't deliberate indifference. Correct, because they don't have that mens rea of intending to do it. A failure to diagnose is a classic scenario of negligence and medical malpractice. I think that even in the Stewart decision, which is one that was recently cited in July, there you had an individual that was very ill. The doctor even testified that I thought he might die and he didn't transfer the patient to the facility, but even then the court said, this court said, that that sounds in negligence and doesn't rise to the level because they didn't believe that he didn't transfer him on purpose in order to cause harm to the individual. And I think it's that intent there that is missing in this case, both from the testimony as well as the record evidence that's within the medical records in this case. For those reasons, I'd like to reserve the remainder of my time for rebuttal. Thank you. All right. All right. Mr. Duck. Thank you, Your Honor. Good afternoon, Your Honors. My name is Kevin Duck. I'm here on behalf of Jamie Zahnbruecker's children. Your Honors, on February 24, 2013, at 2.46 p.m., Jamie Zahnbruecker arrived at Prevost Hospital. He arrived in the back of a deputy's car. An emergency physician greeted him. He was dead on arrival. He found Mr. Zahnbruecker in the backseat, covered in feces that was actually emanating from his nose and his mouth. We've got the facts, so why don't you zone in on, you know, the form of the Brennan Standard and its progeny, which counsel Opposite has, you know, argued vehemently and vigorously of our cases. You know, we've got the facts down. I understand. And all their detail. How does the district court's judgment, put aside the reasons, the field is from the judgment, but how does this judgment stack up with what Farmers and Goldberg and those cases say proves out deliberate indifference? Your Honor, let me address each defendant individually. All right. So, with respect to Nurse Reshore, based upon the argument that's pronounced by the defendants, it seems that they also, too, they say that the plaintiff focuses on a very unfortunate end. But they disregard what happens from the 18th to the 24th. So, let me suggest this to the court. On February 18th, okay, and these facts are relevant to the argument. On February 18th, when Mr. Zornbraker completes a form, which is the process to receive medical treatment, there's a part on that form that you can identify for the health care provider on the nature and whether it's an emergency condition or not. On the 18th, he notes to them, emergency condition, rather than just, I need an aspirin, I'm running a little fever, emergency condition. When I questioned Nurse Reshore about that, I said, let me ask you, in the same time with this particular individual, was he a whiner? In other words, was he someone that you would take that complaint seriously? And she said, he was not a whiner, and that, yes. They were put on notice on the 18th that this man was claiming his pain was so severe, it was an emergency condition, and he was seeking treatment at the hospital with a physician. You heard Mr. Watson, the process is he doesn't even get treatment until the 19th. He doesn't see anybody until the 19th, because that's the process. But Nurse Reshore had notice of that on the 18th. And the reason I bring that up is because, remember, they're focusing on the end. The case law, the standard says that any deliberate indifference that makes the inmate suffer pain under the criteria is a violation or constitutes deliberate indifference, a violation of the Eighth Amendment. So what I would ask the court to also keep in mind is that if, and of course I'm assuming this argument, if the court were to say, okay, well, they didn't really know at the end of the day that he would die, but they did know that he could suffer substantial harm or pain, that occurred throughout from the 18th to the 24th, if that makes sense. You're arguing there were increments of deliberate indifference? Absolutely, Your Honor. I'm arguing that the evidence suggests that on the 18th, he reports, I've got a condition that requires emergency treatment. I'm in severe pain that Nurse Reshore has put on those. You're saying that he may have been in court? The 18th isn't the date? No, sir. No, Your Honor. On the 18th is when he makes the complaint. On the 19th, he comes back. He makes another complaint, okay, at that time. Nurse Reshore is unable, she says she's unable to see him at the time of his appointment because he is in court. Okay. She says, well, he returns. I don't know why he didn't come back. Well, he was brought back to the cell sometimes later in that evening. On the following day, so he does receive, she prescribes ibuprofen, which, as Mr. Watson said, was indicative that at least she's acknowledging that she's getting some forms of complaint that he's in pain. On the 20th, he files another request for treatment, and he again doesn't get medical treatment. He's not seen. He's not examined. There's no treatment provided. So as you asked, Your Honor, yeah, there's increments. So even if you don't see the end of the day, there's the 18th, the 19th, the 20th that he's claiming the need for emergency treatment and severe pain. He's not had a bowel movement in four days. And, Your Honor, on the initial complaint when he's giving this, let me just, this is pertinent, this is in the records too, is that the initial complaint comes on the 18th, but the complaints that he's telling them about saying this has been going on. In other words, prior to the 18th, he started experiencing problems. He didn't go whine and run and complain and say, oh, look, hurry up and give me. When he got to a point where he was in such severe pain, on the 18th, he's saying, I'm hurting. I need a doctor. But he doesn't see anybody on the 18th. On the 19th, he doesn't see anybody. They give him some ibuprofen. On the 20th, he doesn't see anybody. Is there anything in the record inconsistent with the view that they would think he's in severe pain because of constipation? So they just make a misdiagnosis. Is there anything in the record . . . Suggesting, which one? I'm sorry. Suggesting that these nurses didn't think throughout that it was constipation. Thinking that it was something other than constipation? Yeah. Yeah. Well . . . Is there anything to say that they, I mean, it could have been a tragic misdiagnosis, but this is, I guess, a factual question and a legal question. Let me make the legal question first then. Do you know of any case where a court found deliberate indifference when the patient didn't acknowledge the condition that is found to be the cause of death eventually? No, Your Honor. I'm not aware of that. I know counsel for the case they cited in that . . . And I'll make this argument. I'm not trying to evade the question. No, I know you're not. So the case that they cited in their rebuttal brief, Your Honor, they point out, they said in that case, he advised them that he had a pulmonary disorder and that he needed treatment. Okay? In this particular case, and I'd like to point something out for the court, because it's also in the record, even though it wasn't argued. And it wasn't argued, not on my point, simply because it just wasn't raised by them, so I didn't raise it. But the point was is that when they say that he didn't tell them about the diverticulitis, he wasn't, at the time of his incarceration and when they are seeing him, he didn't have an active, ongoing problem with diverticulitis. So in other words, it's misleading to suggest if you're diagnosed with diverticulitis or if you have some bout with diverticulitis years in the past, and it's not active, but you haven't had any problem, that you were experiencing, or when you were incarcerated, you had diverticulitis and you failed to tell them. Okay? That's number one. Number two is, when they say about all the other conditions he reports, I went through with the nurses the intake form. So the reason they get all of that other information is because the nurses fill out a bunch of boxes. Do you have heart disease? Have you had this? Have you had that? And he fills out the boxes accordingly based upon his history. Unfortunately, the boxes don't say, have you had an abdominal disorder? Have you had diverticulitis? It doesn't say that. So it's not, and of course, under these circumstances, we're not dealing with a personal injury case, like let's say where somebody is injured and they had a prior back injury and they failed to disclose it because they're hoping nobody finds out about the prior injury. This is a situation, this man, there's no reason for him to hide that information. So my point is, is that A, he's not experiencing, he hadn't experienced at any point in time an immediate prior where that it was even on his mind. But B is, is that it's not like when you and I go to a physician and they sit down with you and they go in depth about your medical history. It's a form. You fill it out. You process. And unfortunately, the form's not complete. So the reason I raise that is, is that what I, actually I look at it a different way. I say when you've got somebody who says they hadn't had a bowel movement in over four days, when they tell you that the medication you're giving isn't working for them, when they talk about the bowel movement they had, that's the point, and this I will admit may be more of a negligence with respect to that. When they said, well, he said he had a bowel movement. That in itself is not evidence that he doesn't have an obstruction. Yeah, the issue really, the whole, the medical issue is whether he had an obstruction. Right. Because that's what could kill you. Right. Right there. Right. So, but I would suggest to this to you, when you've got, when we talk about, because deliberate indifference is a state of mind, but what we have to make that determination upon is the facts that we see, right? So the facts are, is the complaints that he's making, that he's writing down and asking again for emergency treatment is, he's got abdominal pain, he's got back pain, okay? He's got constipation when he complains of four days, then he's vomiting. There is no evidence that Mr. Zollenberger said he vomited because he didn't like the taste. That's a conclusion that the nurse reached because she said, yeah, they don't like magnesium citrate. The problem here is the issue, the thing that could have killed him was, and did probably, was the blockage, was a blockage, and when he said that he had had a bowel movement, they then thought, well, so, whatever his blockage is, it's resolving. And that's a fair conclusion. Well, let, and I understand where Your Honor is going, so let me address that specifically, okay? So what happened after that? Then after that, she had contact with him again in the form of he complained he vomited, okay? That's where she drew a conclusion that, okay, well, it's the magnesium citrate, okay? All right. So you could say under those circumstances, maybe you can portray that as reasonable. I don't think so when you take into consideration what's happened in the past. But then that's on the, I believe that's on the 22nd. So on the 23rd, then Nurse Godin is advised again. This is because this is Nurse Godin. By that time, what you're talking about, Nurse Godin was examining him. On the 23rd, when he's examined again, he's complaining. Now on the 23rd, which is a Saturday, he's complaining to the jail personnel, get me medical treatment. Their call in is to Nurse Godin. Nurse Godin says, I called, I talked to somebody, they said somebody else handled it, okay? There was no follow-up on whether or not how, what he was doing. Mind you, this nurse is the only nurse that's familiar with his history, okay? This nurse and Nurse Richard. Nurse Richard is the nurse assigned to the unit, and Nurse Godin oversees the supervisors, okay? So Nurse Godin has that information on the Saturday. Then on the Sunday, the date of his death, Nurse Godin is again advised of not only his deteriorating condition, but the fact that his vitals were now suspect, okay? So the point being is that, again, if we would break it down, I would then that led her to believe that maybe the condition was clearing up. At that moment in time, it may have been reasonable. But then when the problem persists, he's not getting better. In fact, his condition is deteriorating, and she fails to take any action. She takes none. There's no action. The only action that's taken when there's a question of whether or not she should monitor. Well, I would adopt Justice Dennis's dissent with respect to the case that was cited by opposing counsel, which says monitoring is not medical treatment. You're not alleviating a symptom. You're not giving further directions with respect to how to help that particular patient. There was a general idea saying, well, keep an eye on him. There was no increment of time to watch him. But, I mean, it is difficult to focus on Judge Dennis's dissent in Henson because it wasn't convincing to the majority. Well, I mean, I see your point, and Henson is another one of these tragic cases. But to focus on Judge Dennis's dissent, he did say what you said, which is monitoring isn't treatment. But ultimately, those facts are not too dissimilar than these. And as you and I both discussed, there the individual did say, I've got the pulmonary disorder. So how would Henson . . . well, I guess it's unpublished may be your answer. The majority ruling wasn't consistent with Jim Dennis's point. Correct. No, you're right. You're right. Well, how do you distinguish Henson? Well, actually, let me . . . I would distinguish that case. This is how I would distinguish that case. In that case, at least my reading of it, my interpretation was, there's one point they made, especially with respect to the vitals. In other words, if I recall correctly, the gentleman in that particular case's blood pressure was like 202 over 101 or 110 or something like that. It was pretty bad. And the majority's opinion was . . . the way I read it was they said, well, there was no evidence presented that that particular . . . that A, that led to his death, and B, that that particular reading or vital necessitated emergency treatment. And there was a comment on . . . they actually said the dissent . . . this is . . . they basically commented on the evidence. They said, we don't take . . . is this the type of evidence you actually do judicial review on, i.e. a website? Because it would seem to me that what was drawn was the evidence wasn't presented at trial. And so, Justice Dennis had drawn and said, well, look, I looked up the website, which you can, on heart.org, and it says that if your blood pressure exceeds 180, that on the . . . 180, you need emergency care. I mean, zeroing in on that, their bad vitals were the whole day before he gets sent to the hospital. Here, we get bad vitals. This is the reason I asked opposing counsel. And right away, they say, okay, now go to the hospital, not in an ambulance. Yeah, that's interesting because what they fail to mention is that at no time from the 18th to the 24th were any vitals taken. At least there's no records of those. I know, but that's different. I mean, the nurses didn't know. No vitals in both cases. And in Henson, still another day. Here, right away, nurses say, oh, this may not be constipation. We're seeing, you know, asystolic stuff right away. She said that. She just didn't say in an ambulance on it. Right? Right. Right. She said, you're talking about, yeah, in this particular case, you are correct, Your Honor, when she spoke with the deputy and the deputy indicated his vitals, she said, okay, bring him to the hospital. And you are correct because that was part of my argument. I do know that Henson said, and all I can tell you, Your Honor, is I disagree with that. It's unpublished. It's not controlled. Yeah, but was to say that I think they said in that particular case, Your Honor, was that the fact that she chose not to send him by ambulance, that's not delivered indifference. It's just, you know, I would suggest that in light of everything and the fact that it's in here, it took him over, and I think the district court pointed that out, it took him over. Of course, that was relative to other defendants, including the jail, but it took him over an hour to get to the hospital, which is a 15-minute drive from the facility. Once it was told, he needs to get there. And he arrived dead on arrival. He was already gone. But what I wanted to point out, what was different about that case, was that an opposing counsel said this, and maybe it's just the way you define things. They said he was never refused treatment. Well, when you ask for emergency care on February 18th and you don't get any, that's refusal to me. That constitutes refusal. When you ask to see somebody, you need a doctor because you need emergency care on the 19th, and what you're given is ibuprofen, that's tantamount to refusal. Because it's, I think what's captured in there, to me, their belief of what their obligation is relative to the inmate, and medical treatment was captured in their brief when they say, well, if you give any treatment, that constitutes, you can't get deliberate indifference if you give treatment. And I don't think that's correct. But then again, as Justice Stewart pointed out, or my argument with respect to that is, is, yeah, there's incremental. In other words, I don't think that I have to show that ultimately the end result constitutes the violation of an Eighth Amendment violation. I think that you can take individual each day because the guy's suffering needlessly based upon his request for medical treatment that he's not getting. So, I don't know if that addresses, but like I said, that was how I was going to distinguish that case that was pointed out. In that particular case, the nurse saw him on two occasions, and she said, I'm going to send you to the doctor tomorrow. Well, unbeknownst to the nurse, and I think that's what went into it, was unbeknownst to the nurse, the doctor didn't come in that day because it was Thanksgiving in the Henson case. And then the next question became, with respect to the vitals, whether or not she should have ordered to send him to the hospital. But on the second argument, that's what I think is, at least my reading of the case, wasn't that the court said, what the court took into consideration was there was really no evidence presented of that at the court that she, that even if they took the facts most favorable to the plaintiff, there was no evidence that she knew under the circumstances that what would result. In this particular case, there are multiple days that treatment is not rendered despite request for emergency treatment. In this particular case, it's almost like, I know we're not supposed to make policy arguments, but it's almost as if it's set up, the institution is set up such that it's to isolate itself from a 1983 claim by basically putting people who lack the level of competence at a point and saying, you know, if one of the guy's complaints is thirst and you bring him a glass of water, then you've provided the treatment and you didn't violate a deliberate indifference, you know. This . . . It could just be a budgetary problem rather than a desire to get around the law. Yeah. It's a very . . . No, and you're absolutely right. It's actually tragic that it seems undisputed that your client wasn't someone who complained loudly, and in this area of law, maybe that works against him too. Right. Those are tough situations. No, Your Honor, and you're right, and that's fair. I argued a case once, which maybe I shouldn't be spending my time on that, but it was a case involving someone who was poor, and basically what the physician testified to is . . . and he was actually a caring physician, but he just said he's poor. He said, unfortunately, poor people, we can't get to them on time. And I said, well, does that mean that he's entitled to a different standard of care than someone who can't pay? And he said, absolutely not. What he was saying was ideal and reality are two different things, and that may be true here. But in this particular case, again, Your Honor, I would stress that there were multiple opportunities that he requested treatment, multiple opportunities for them to provide treatment, and that they did, in fact, refuse that treatment. As the district court pointed out, both Reshard and Godin had enough facts to draw inferences that it was a serious condition. In Reshard's case, and whether that constitutes deliberate indifference will be up to the court, but, yeah, they both admitted that they don't read the intake forms, the complaint forms, because they said your complaints may change, but the inmates don't know that. They're assuming you're getting their condition. Anyway, Your Honor, my time has elapsed. I truly appreciate the opportunity to present the argument on behalf of my clients. Before you leave, I want to take up a matter with you. You don't have to respond to this, but I want you to hear it. Yes, Your Honor. I mean, the argument you made to us as I asked you the question, trying to get around it, was about increments of deliberate indifference. That's not argued in your brief, and the reason it's not is because your brief cut and paste the district court's opinion, and you say several times, the court's written analysis cannot be improved upon, and thus is adopted by the plaintiffs, and then starts quotation marks, and then it goes verbatim through the district court's opinion, and then it picks back up later, and it cut and paste. Here's my points to leave you with. You asked for an argument just like they did. Few of our cases are orally argued. We decide most of these cases on the brief. If your case wasn't orally argued, all we'd ever have is the district court's opinion. Listen. Yes, Your Honor. All we'd ever have is the district court's opinion, which we already have. Do you follow what I'm saying? Oh, yeah. I hesitated on this, but after I heard your argument, you obviously have great command of the case, and you made your arguments, but I'm saying to you, given that most of our cases are decided on the brief, it is more helpful to us if we had the argument you made to us in the brief for whatever benefit it is for us to pursue that. You follow me? If we had denied oral argument in this case, we'd have the district court's opinion, which we already have. We would never have your argument. That's the point I'm raising. Briefing is for briefing, not to cut and paste on it. I'm not saying whether the arguments are dispositive, but you've made my point, I think, on why don't just cut and paste the district court, but give us your arguments, because when you said the incremental piece, I don't think I've heard that. I'm not opining on whether it's a winner, but it's the point that . . . brief it. Absolutely. You get my point? Brief it. That's really the point. Whether you win or lose here is not dispositive on the point, but . . . Point taken, Your Honor. All right. That's all. I appreciate it. All right. Thank you all very much. All right. Thank you. Your Honors, I'd like to respond, opposing counsel in this matter. First, I think the very fact that we are here talking about, reviewing, and discussing medical records, pretermits a finding of deliberate indifference in this case. It's not simply that . . . to broadly state that there was a refusal of care is an inaccurate assessment of the actual facts in this case, and I would implore this court to look at the actual medical records. This is not a patient that was refused treatment. He was in the facility for 60 days, and he had countless interactions with the medical facility because he was being monitored for his glucose and taking those levels every single day. In addition, for a 60-day period of time, he's seen the medical staff for throughout his course of over 15 different occasions he'd see them. So this is not a system where we've got an individual that says, we don't want to see him, hold him in the cell, forget about him. Every time he reported an incident, he came and saw us. And I want to point out to the court, because it's been mentioned several times by my opposing counsel, that somehow Nurse Richard refused to see him on the 18th when he had indicated that there was an emergency with respect to his back pain. That's not accurate. There is no evidence that Nurse Richard knew on the 18th that he had that back pain. What is customarily done is these forms are submitted, and then the next morning, which is the 19th, she creates a sick call list based upon these individual medical records, and from that, the individual is called. Here, we know we don't have a refusal to treat because she doesn't come out and say, I'm not seeing him. She reports in the medical record that inmate is in court this morning, ibuprofen refilled. So she reviewed the complaint that morning and filled it, and it wasn't her fault. She didn't say, I don't want to see him. She says, he's in court. And then she does, in fact, see him. The next day, he fills out another one, and then she sees him. So we don't have a pattern of refusal to treatment at all. And so I just wanted to point that out for the court. In addition, I want to respond to Chief Judge Stewart's comment about incremental deliberate indifference, because that's simply not found here. I don't think you can just culminate the context, look at the end result, and say something must have gone really wrong here, which rises to the level of deliberate indifference. You have to look at the mindset of each individual actor on each specific incident to make that. You can't pull this in. Nurse Richard was not working with Nurse Godin at the time, so you can't impute that knowledge from that visit. I think it's important to note that the severe back pain, which many inmates complain about due to the conditions of sleeping on the hard couch on Friday with Nurse Godin, it was a completely separate and independent complaint of the belly tightening and the abdomen, which was distinct from what Richard was dealing with, which was the back complaint, which he, in fact, did provide treatment in the ibuprofen. And again, the fact that she's providing treatment, it's documented in medical records, gets this in the area of medical malpractice and not deliberate indifference. Finally, I'd like to just point out again to the court that in order to find deliberate indifference in this case, you've got to have one of my nurses telling this patient, I'm not going to see you or telling the staff we're not going to treat you or do not take him to the hospital under any circumstances. He's lying. He's faking. Don't believe him. Don't do anything. We don't have that in this situation. We've got complaints, responses, and they may be upset with the end result and they may be upset with the way these responses were done, but they've got their day in court under a negligence theory of liability and they can present their expert testimony and we can present ours and we can move forward on this as a negligence matter. I think that the precedence of this Fifth Circuit is routinely found in cases involving this. If you look at the Browner decision that came out in July, which cites to the Gobert decision, which cites to the Stewart decision, which cites to the Farmer decision, these are all cases where you've got conduct of nurses, conduct of health care providers that are providing to the best of their abilities what they can do, and if there is care involved and there isn't that purposeful direction to not provide care, you've got to find that qualified immunity applies. And I think that the district court looked at the end result and he crafted the facts to fit a deliberate indifference which is not sanctioned by this court and has not been provided for in any precedence cited by opposing counsel or, in fact, even by the court. All the court does is attempt to try to distinguish Gobert by claiming that in Gobert there was several treatments and follow-ups, but what's important to note and the reason why that's distinguishable is in Gobert the physician treated the patient over two and a half months. Here, Robin Richard, it was three days before this patient had the ultimate demise, so there wasn't the same opportunity. So in a three-month period in Gobert, the court found that wasn't a deliberate indifference clearly in this case with two times that she saw the patient. It cannot be. For these reasons, I respectfully request that this court reverse the district court's judgment. Thank you for your time. All right. Thank you. Both sides. That completes the cases for this panel for this week. They'll all be submitted.